# EXHIBIT 2

In the Matter of Arbitration

Between:

**MONONGAHELA VALLEY HOSPITAL, INC.**


and

**UNITED STEELWORKERS OF AMERICA,**

**LOCAL UNION 8041**


Re: Arbitration/Vacations
FMCS Case 1754017

**Appearances:**

**For Monongahela Valley Hospital:**

**Hayes C. Stover, Esq, Attorney**
**Louis Goodman, Senior Vice President, HR**
**Lisa Petro, Director of Human Resources**
**Suzanne Vercamen, Administrative Assistant**

**For United Steelworkers of America, Local Union 8041:**

**Wayne A. Donato, USWA Staff**
**Richard McGinn, President, USWA Local 8041**
**Mark Conkle, Vice President, USWA Local 8041**
**Kimberly Gorski, Recording Secretary, USWA Local 8041**


<u>**DECISION AND AWARD**</u>


**Dated:  February 20, 2018**                    **Gerald Kobell, Esq.**
                                                **Arbitrator**

1

I.  Statement of the Case:

The Arbitrator, Gerald Kobell, Esq., was selected by agreement of the parties to hear and decide the issues involved herein. An evidentiary hearing was conducted on December 15, 2017 in a hearing room at the Holiday Inn Express, located at 183 Finley Road, Belle Vernon, PA. At the hearing, the parties were afforded a full and complete opportunity to introduce any evidence they desired, which was effectuated through opening statements, testimony, exhibits, and briefs by the parties and their representatives with respect to the issues presented.  The parties elected to file briefs, which were received on February 5, 2018, and circulated by the Arbitrator by e-mail, and by counsel by mail, at which time the record was closed.

II.  Applicable Collective Bargaining Agreement:

The collective bargaining agreement (Agreement)[1] between Monongahela Valley Hospital, Inc. (MVH or the Hospital) and United Steelworkers of America, Local 8041  (Union) relevant to this case was in effect from  July 1, 2014 to and including June 30, 2017.

The following provisions of  the Agreement are relevant to this dispute:

## SECTION  2 – RECOGNITION

A.  **Bargaining Unit**

The Hospital recognizes the Union as the sole and exclusive bargaining agent for the purposes of negotiating wage rates, hours of work and other conditions of employment for all of the

---

[1] JTX-1 When used herein, JTX refers to joint exhibits, MVHX refers to Hospital Exhibits, and UX-1 refers to Union exhibits.

2

employees of the Hospital excluding nurses, supervisors, confidential and all others as defined in the National Labor Relations Act.

(Balance of Section 2 omitted)

## A.  Rights

The management of the Hospital's facilities and operation, and the direction of the working forces, including the right to establish new jobs, increase or decrease the number of jobs, change materials, processes, services, equipment and operations shall be retained by and be vested exclusively in the Hospital. The Hospital has the right to schedule and assign work to be performed and the right to hire or rehire, promote,  recall, transfer, or layoff employees because of lack of work and to demote, suspend, discipline or discharge employees for just cause, subject to the provisions of this Agreement.

## B.  Non-Bargaining Unit Personnel

Nothing herein contained shall be deemed to prevent supervisors and volunteer workers from performing those tasks which they have performed in the past.

## C.  Contracting Out

It is the Hospital's intention to use its employees when reasonable and practicable for work performed at the Hospital.  The parties have existing rights and obligations with respect to various types of contracting out.

## D.  Rules and Regulations

The Hospital may continue to promulgate reasonable rules and regulations if such are not in conflict with this Agreement.  The Hospital will provide the Union with copies of rules and regulations which affect wages, hours and conditions of employment within the Hospital.

## SECTION 13 – VACATION

## B.  Scheduling of Vacation

(1)  Vacations may not be accumulated and must be taken within the calendar year for which it is due, except that an employee who becomes entitled to vacation following completion of his

anniversary year, or an additional week's vacation as a result of an incremental increase, during the last two (2) months of the calendar year, may take such vacation during January on the following year.

(2)  Employees with one (1) or more years of Hospital seniority who give written notice of intended resignation equal to their annual vacation eligibility shall be entitled to terminal vacation pay if satisfying the requirements of Paragraph 3. In the event of an employee's death, the earned vacation shall be paid to the estate provided such employee had one (1) or more years of Hospital seniority at the time of death.  Employees terminating without proper notice shall not be entitled to terminal vacation pay.

(3) On December 1, of each year, each employee entitled to or expected to become entitled to take vacation time off, will provide the Hospital with the period or periods he/she desires on forms provided by the Hospital.  These forms will be provided to employees by November 1.

(4) Vacation periods will consist of seven (7) consecutive days, except that the employees with five (5) or more years of service as of  December 31 of the previous calendar year may use up to five (5) days of the vacation year in blocks of one (1) or more days but less than five (5) days and employees with twenty (20) or more years of service as of December 31 of the previous calendar year may use up to ten (10) days of vacation per year in blocks of one (1) or more days but less than five (5) days.  The Hospital will make every reasonable attempt when requested, to schedule an employee's vacation so that the employee will have nine (9) consecutive days off. Employees may request specific days in advance under Paragraph 3, but must indicate the employee's intention to request individual days and waive seven (7) or nine (9) day requests. The employee may also request individual unscheduled vacation days during the year by written requests prior to the posting of the schedule, or in emergency situations for which advance requests are not possible.  In all circumstances, the supervisor shall have the final right to allow individual unscheduled days.

(5) The approved vacation schedule will be posted not later than the First Monday of January of the year in which the vacation is to be taken.  Following the posting, employees may submit a written request for open weeks no later than the Third Monday of January, which requests shall be granted in accordance with paragraphs 6 and 7.

(6) Vacation will, so far as possible, be granted at times most desired by employees; but the final right to allow vacation periods, and the right to change vacation periods is exclusively reserved to the Hospital.  Any changes in vacation schedules may be realized by mutual consent. In the event that the Hospital unilaterally changes a schedule causing the employee to suffer financial loss, the Hospital agrees to reimburse the employee for provable loss.

(7) Employees will be given preference in the selection of vacation time in accordance with their Sectional continuous service.

4

(8) In an illness or accident preventing work occurs prior to and extends into an employee's scheduled vacation, the affected employee may opt to have his vacation period continue with appropriate pay, or elect to have the vacation postponed and another period assigned. However, if payment is elected by the employee for the designated vacation period, no other payment will be made under any of the provisions of this Agreement for the paid vacation period. If an illness or accident preventing work begins after an employee commences his vacation, the original vacation as scheduled shall remain in effect, and no other payment will be made under any of the provisions of the Agreement for the paid vacation period.


III. Statement of Facts:


In several departments of the Hospital, according to a custom and practice established many

years ago, supervisors who are excluded from the bargaining unit in smaller departments work

alongside employees who are included in the bargaining unit, often on a daily basis.[2] There have

been a few instances, described later herein, when an employee in the bargaining unit was denied

his or her first vacation choice because the same period was also chosen by his/her working

supervisor. Although the Hospital appears to have been reasonable and fair in most instances in

preparing the approved vacation schedule, according to the Union, it has not always been so in

allocating vacations. This case concerns the asserted right of bargaining unit employees under

the Agreement to select their desired vacation, even if that vacation period is also desired by the

working supervisor.


Richard McGinn, Union President, has been employed in the Hospital's engineering department

for 42 years. He described that a number of departments with working supervisors are quite

large, some consisting of 80 employees, but he acknowledged that many have special skills or

---

[2] JX-1 The Agreement in SECTION 4 – MANAGEMENT Paragraph B states that "Nothing herein contained shall be deemed to prevent supervisors and volunteer workers from performing those tasks which they have performed in the past." This case does not concern volunteer workers.

licenses and that they are not all interchangeable during vacation weeks. He described three instances, one in 2006, another in 2011, and a third in 2016 when employees were not granted their desired vacation schedule because it was also selected by their working supervisor. In two of those instances, the unit employee did not receive his/her preferred vacation, while in the third instance the issue was satisfactorily resolved. Although the Union believed then as it does now that employees in the bargaining unit, based upon the recognition clause in Section 2, should always be given their preference, even if it conflicts with their working supervisor's preference, the issue was not submitted to arbitration.[3]

On or about December 30, 2016, a dispute arose between Carol Konsigar and her working supervisor concerning Ms. Konsigar's desired vacation[4]. On November 15, 2017, a second dispute arose between Lisa Baccelli and her working supervisor concerning her vacation.[5] This is the case that was submitted to arbitration, as representative of the vacation scheduling dispute.[6] On December 11, 2017, just four days before the arbitration hearing in this case, Meredith Lorenz was told by her working supervisor in the credit department that she could not have the same vacation weeks requested by her working supervisor. [7] It is the third representative dispute. The Union does not contend that there has been a "reckless application" of the Hospital's policy with respect to conflicts between working supervisors and bargaining unit employees, but the problem exists contractually, and should be resolved.

---

[3] Union President McGinn's testimony described three relatively rare occurrences of this problem during a ten year period. The instant grievance covers three instances during 2016-2017. There was no explanation offered either at the hearing or in the briefs of counsel for the sudden surge in conflict over vacation schedules for bargaining unit employees in departments where they work alongside their supervisors.
[4] See UX-4
[5] See UX-2
[6] See JX-2, JX-3 and JX-4
[7] See UX-3

6

Louis Goodman, Senior Vice-President of Human Resources since September 2013, testified that there are approximately 1100 Hospital employees, and about 500-525 in the bargaining unit. He described the process now in place concerning vacations, and that the Hospital endeavors to follow bargaining unit seniority. Some departments take the shift into account as well, while others may not do so, but ultimately, if there is an irreconcilable conflict, the decisions are based upon managerial and operational needs.

Approximately two years ago, in an effort to reduce or eliminate vacation scheduling conflicts, the Hospital and the Union agreed, as understood by the Hospital, that the Hospital could designate "blackout periods" when a working supervisor's wishes could prevail over a unit member's desired vacation, but that in non "blacked out" weeks, seniority would control.[8] The Union believed that the "blackout periods" meant that no one would take vacations during that specified period. It did not work out that way. After the year was over, management concluded that the experiment was unsuccessful, and they withdrew what they thought was the Union's agreement to continue it.

Mr. Goodman testified concerning the Hospital's practice and policy based upon the then applicable collective bargaining agreement with respect to unit employees. The agreement between the Hospital and the Union, effective May 1, 1974 ,[9] provided that "each employee's vacation period shall be designated by the Hospital to meet the requirement of operating

---

[8] See UX-5, UX-6
[9] See MVHX-1

7

conditions, [10] provided however that the period preferable to the employee on a department seniority basis shall be selected whenever possible." The July 1, 1977 agreement [11] contains the same language in the vacation article (Section XV (8)) as it does now, except that the Article and Section numbers changed over the years. The Hospital's Personnel Policy Manual repeats the same language now in Section 13 (B)(6) verbatim with respect to the vacation policy to, insofar as possible, grant vacations on the time most desired by employees, and the proviso that the final right to allow vacation periods and the right to change vacation periods is exclusively reserved to the Hospital. [12]

In 2009, the Union endeavored to amend the language in Section 13 (b)(7) by adding the words "Bargaining Unit" to the beginning of the sentence and adding that "Non-bargaining unit employees will not be given vacation scheduling preference over bargaining unit employees". [13] The requested amendments were rejected by the Hospital and were not included in the agreement for 2009. There was no request to include the amendment in the current negotiations to reach a new agreement continuing after June 30, 2017. [14]

Mr. Goodman further testified that the Hospital's policy continues to be to schedule unit employees' desired vacations whenever possible, based upon seniority, and Hospital supervisors

---

[10] The 1974 agreement also provided that in connection with holidays, "The Union recognizes that the Hospital's operations require continuous service to patients, and it is agreed that the Hospital shall have the right to require any employee to work on any of the designated holidays."

[11] See MVHX-2

[12] MVHX-3, MVHX-4

[13] See MVHX-5

[14] The Union in its brief objected to any reference to the 2009 or earlier agreements since they were not on notice that there would be any reference to them and that they had no one in the hearing room able to refute or address the Hospital's proffered testimony. Although there was ample time to endeavor to do so, they did not seek anyone with knowledge about the negotiations. I agree that it would have been better for them to be prepared for it, but insofar as it is relevant, it was admitted. In any event, the exhibit and testimony concerning it do not change the result herein.

and managers endeavor to be fair and reasonable, but there are a few occasions when that is not possible. This is so because regardless of the size of the unit supervised by a working supervisor, many employees have either special skills or licenses and cannot substitute for each other during vacations. He also added that working supervisors and their supervisors are also mindful of vacation requests such as weddings and funerals when the dates are fixed, and that those employee requests would somehow be accommodated. In all cases, decisions to approve vacation requests are first decided by the supervisor in the department, including working supervisors, and occasionally, in the event of a conflict, the matter reaches a second level supervisor, with operational needs as the ultimate criterion. In almost all instances, the employee and the supervisor endeavor to work out the problem collegially, and they are successful. He did, however, concede that in one instance, summarized by the Union, the working supervisor and the employee both desired the same vacation, and the working supervisor, in the exercise of her managerial discretion, denied the bargaining unit employee's leave request, even though the bargaining unit employee had substantially greater seniority.

IV: Positions of the Parties:

A. The Union [15]

The Union contends that the Hospital denied Ms. Konsugar's vacation request because her supervisor requested and received the same week. Ms. Konsugar has 37 years of loyal service to the Hospital and is "Senior" to her supervisor by decades, yet could not get her requested week of vacation. Union Exhibits 2 and 3 are other examples of Bargaining Unit Employees who were

---

[15] Inasmuch as the Union bears the burden of proof in this case, its position is set forth first.

denied vacation requests that were ultimately awarded to "junior" supervisors.[16] The Union relies

upon, among other cases, Arbitrator Kesselman's award in *Air Reduction Chemical & Carbide

Co.* [17] where he stated, "The Company has the final right to determine vacation periods only: a)

during shutdowns after proper notice, and b) when the orderly and efficient operation of the plant

is endangered by developments such as production  needs, emergencies, labor shortages, etc. **and

not in order to give prior vacation choices to supervisory personnel purely on the basis of

the latter's preference unrelated to production needs."**

Arbitrator Sylvester Garrett noted  his findings in a case cited at 15 Steel Arb. 11, 136,  that the

**"final right" to allot and change vacation schedules is not an absolute and unfettered right.

Instead, it is a right which must be exercised on the basis of what is necessary (or

reasonably appears to be necessary) at the time of scheduling, or revising a schedule, "in

order to insure the orderly operation of the Plants."**  Arbitrator McDermott, in a case cited in

P.A. File No.643-11 has similarly stated that ..."the absence of a particular individual will cause

an impairment of normal operations" is the controlling factor if it will cause **"an impairment of

normal operations."**

As is clear from Union Exhibits 5 and 6, during 2016, the week of December 18 was blacked out

to the Bargaining Unit only, and Ms. Konsugar's request was denied and her Supervisor, (junior

in seniority) was awarded the week. Similarly, when reconciling Union Exhibits 2 and 5, Ms.

Baccelli's choice of the week of July 24 was not only her initial choice, but also her alternate

---

[16] Lisa Baccelli and Michelle J. Lorenz
[17] 42 LA 1192 (1964)

choice for all selections. This week was not blacked out to the Bargaining Unit yet was awarded to Supervisor Gray, who was years her junior.[18]

The Union adds that it must be noted that Union Exhibit 5 states, **"FOLLOWING ARE BLACKOUT DATES THAT ARE NOT AVAILABLE FOR 2017 VACATIONS."** The title begs the question "Not available to who?" Selections were awarded to management personnel in weeks denied to Bargaining Unit members. This is a clear violation of the line drawn in the **RECOGNITION** section of the Agreement and is an egregious example of the Hospital's arbitrary and capricious actions in this matter.

Last, the Union argues that the Hospital submitted MVHX- 1, 2, 3, and 4, presumably to demonstrate changes in the Vacation Section of the Agreement and Policy Manual and their evolution over the years and have no impact in this instant matter.

Moreover, MVHX- 5, was submitted to confuse the matter and imply that the Union waived its right to grieve and somehow impacts these proceedings. The argument comes too late. The "new" evidence was not presented to the Union at the previous steps of the grievance procedure. Was it withdrawn? Was it discussed "off the record"? No testimony was given to authenticate or verify the legitimacy of the exhibits (MVHX-5 and 2), nor did the Union have the opportunity to cross-examine a witness relative to Exhibit 5, as no employee from the hospital present at the hearing was employed by the hospital in negotiations in 2009. The language in Section 13, **VACATIONS** is not ambiguous. The contract states what the parties intended.

---

[18] There was no testimony concerning Ms. Bacelli's skills or her duties, and where and when she was needed during her vacation week. The same is true of Ms. Lorenz

11

B. The Hospital:

The Hospital recites that at the hearing, the Union for the first time identified employee Konsugar as an employee who requested specific periods of vacation. (UX-3. ) The Union alleged that the Hospital rejected her request by giving the periods to a non-bargaining unit employee who had selected the same vacation period.  In fact, Ms. Konsugar received her first three selected dates. No employee in her department received the December periods because the Hospital blocked them out for all employees. Even though Konsugar is not an affected employee, the broad question identified in the grievance may be resolved.

The Hospital refers to Union President Rich McGinn, a 42-year employee who said that the Union was challenging the Hospital's position that in awarding vacation periods, the Hospital could consider requests of both bargaining unit and non-bargaining unit employees. McGinn stated that the Hospital has over a long period of time consistently maintained that it may award a  non-bargaining unit employee vacation over a bargaining unit employee.  The practice has resulted in three grievances in the past. In the two instances, the grievance was denied and not appealed to arbitration. In the third instance, a solution was found to give vacation to both employees.

McGinn stated that the issue arises in small departments. These departments may have working supervisors who do bargaining unit work. McGinn stated that the Union's position is based upon the Recognition Clause, Article 2 A in the collective bargaining agreement. McGinn then

12

introduced UX-2, 3, and 4 as claimed examples of bargaining unit vacation denials. McGinn claimed that in Radiology with 100 employees that reassignments could have been made. However, he admitted to the Arbitrator that among the 100 employees there are many different job classifications.

On cross-examination, McGinn confirmed that in two of the three grieved instances, the Hospital denied that grievance and no appeal followed. In the third, both employees received vacation. McGinn stated that the Union's position is that bargaining unit employee always prevail if a conflict exists. In referencing UX-2, only 12 employees perform the function in question. McGinn also confirmed that in the larger fiscal department, there are many different job classifications.

The Hospital's Senior Vice-President Louis Goodman, since 2013, testified that the Hospital has 525 Union employees and 600 non-union employees. When several employees performing the same limited job function request the same vacation, the manager makes a decision based upon the needs of the patients and the hospital.

For 2017 vacations, the Hospital attempted to resolve the conflict issue by simply blocking out weeks of vacation and giving non-bargaining unit employees vacation during those weeks in accordance with what Mr. Goodman believes was a practice acceptable to the Union. Further information about this experiment is reflected in UX-5 and UX-6. In any event, the Hospital did not repeat the practice for the 2018 vacations.

13

Mr. Goodman identified Hospital Exhibits 1-4 respectively containing excerpts from the 1974 collective bargaining agreement, the 1977 agreement, the vacation policy in the Hospital's Personnel Manual from 1977, and MVHX-4, the current Personnel Manual vacation policy which is identical to the 1977 policy with respect to the selection of dates. Mr. Goodman noted that under section 4(D) of the collective bargaining agreement, the Hospital may issue binding policies not in conflict with the collective bargaining agreement.

Mr. Goodman states that the Hospital has consistently interpreted the collective bargaining agreement as allowing consideration of availability of both bargaining and non-bargaining unit employees who perform the same or similar functions when awarding vacation selection. Mr. Goodman also identified MVHX-5 as a 2009 collective bargaining proposal by the Union to change the collective bargaining agreement to accomplish a result that the Union now claims is required by the current language. Mr. Goodman concluded by stating that the Hospital is not claiming the right to always allow non-bargaining unit employees to prevail in case of conflict, but rather to make decisions based upon patient needs, fairness, and circumstances.

On cross-examination, Mr. Goodman explained that in the situation of Carol Konsugar, her request could not be granted because of expanded hours at the HealthPlex where she worked.

The Hospital argues that this arbitration presents one clear question: "Does the collective bargaining agreement require that in all circumstances, bargaining unit employees be given absolute preference over non-bargaining unit employees when vacation preferences conflict?" The Hospital believes that the collective bargaining agreement does not give absolute preference

14

to either bargaining unit or non-bargaining unit employees.  The collective bargaining language itself, confirmed by an admitted past practice and historical documents, prove that the Hospital's interpretation is correct.

The conflict of vacation period requests is not a regular occurrence. It occurs when a limited number of bargaining unit and non-bargaining unit employees perform the same or overlapping functions, and only one may be on vacation at the same time.  Under Section 4(B) of the Agreement, bargaining unit and non-bargaining unit employees may perform the same or overlapping duties.

The Union contends that in all instances, the bargaining unit employee must be awarded the vacation.  The Hospital contends that in exercising the discretion articulated in the vacation language, the manager can exercise and make an award that is reasonable under the circumstances.

The Hospital argues that Paragraph 6 of the Agreement is the key provision in that it provides that "so far as possible" the desired vacation will be granted, but the "final right to allow vacation periods, and the right to change vacation periods is exclusively reserved to the Hospital." The Union has yet to articulate an argument explaining how the phrase "exclusively reserved to the Hospital" prohibits the Hospital from considering the vacation needs of the majority of its employees.

The Hospital rejects the Union's argument that based solely upon the recognition clause in paragraph 2A, and on the corollary premise that this language is in a collective bargaining agreement that is only applicable to bargaining unit employees, the Hospital can only exercise discretion if it involves bargaining unit employees. The Union fails to show where that implied limitation is referenced in the "exclusively reserved to the Hospital" language.

The Hospital believes that the language very clearly gives the Hospital the exclusive right to schedule vacations and gives the Hospital the right to consider both bargaining unit and non-bargaining unit employees. The practice is further supported by past practice and bargaining history. Union President McGinn confirmed that the Hospital has consistently maintained its position that it may consider both bargaining unit and non-bargaining unit employees. He confirmed that in two instances when the conflict could not be resolved, the Union grieved, the Hospital denied the grievance, and the denial was not appealed.

MVHX-5 is a Union collective bargaining proposal from 2009. In that proposal, the Union wanted to insert "Non-bargaining unit employees will not be given vacation preference over bargaining unit employees." That proposal was a recognition by the Union that the collective bargaining agreement did not grant its members preemptive vacation rights, and a recognition that the Hospital did not recognize any such rights. That attempt to achieve the result the Union now seeks in arbitration was rejected, and so should its current attempt be rejected.

The initial 1974 collective bargaining agreement, MVHX-1 provided that the Hospital could schedule to meet the requirements of operating conditions, but the employee selection was to be honored "wherever possible".

Two events occurred in 1979. First the vacation scheduling language in the 1977 collective bargaining agreement (MVHX-2) was modified to the language still in the collective bargaining agreement. That language eliminated the "operating needs" restriction, giving the Hospital the exclusive final decision with no limitations. Not coincidentally, the Hospital's Personnel Policy Manual (MVHX-3) was modified in 1977 to provide the same vacation scheduling language contained in the 1977 collective bargaining agreement. That Manual is applicable to non-bargaining employees, and, pursuant to Section 4 D of the collective bargaining agreement, to bargaining unit employees where there is no conflict with the collective bargaining agreement. Just as the scheduling language in the collective bargaining agreement does not restrict the Hospital from considering non-bargaining employees, neither does the Personnel Manual. That same language continues to appear in the current Manual. (MVHX-4) The Manual is applicable to both bargaining unit and non-bargaining unit employees with respect to vacation scheduling. No language in either Manual or the collective bargaining agreement alters the "final right…exclusively reserved to the Hospital."

The Union also attempts to escape the language of the parties' collective bargaining agreement by citing an arbitration decision, *Air Reduction Chemical & Carbide Co.* (UX-1) This decision not only does not support the Union, it supports the Hospital. The contract language in *Air Reduction* stated that "the final right to allot vacation periods, and to change such allotments is

17

exclusively reserved to the Company, in order to insure orderly and efficient operations of the plant. (Emphasis added)

In *Air Reduction*, the parties agreed to language specifically limiting the employer's discretion to insure orderly and efficient operations. No such limiting language is contained in the Hospital's collective bargaining agreement. Indeed, as the earlier comparison of the 1974 with the 1977 and subsequent collective bargaining agreements noted, the limitation that the Hospital's discretion was restricted to meeting operating decisions was removed from the collective bargaining agreement in 1977. Had the Hospital and Union intended any limitation on the Hospital's discretion, the limiting language would have been included in the collective bargaining agreement. The lack of limiting language supports the Hospital. *Air Reduction* is also inapplicable as a guide for the following reasons:

1.  *Air Reduction* arose under the parties first contract with no established practice; Hospital has established the practice supporting its position for over 40 years.

2.  *Air Reduction* applied its practice in only one department, weakening its argument.

3.  *Air Reduction* simply blocked out weeks for supervisors for an absolute preference; Hospital balances conflicting requests.

4.  *Air Reduction* carved out supervisors who did not perform bargaining unit work. This instant grievance involves conflicts between individuals who actually perform the same or complementary work.

5.  The parties in *Air Reduction* used existing standard industry language which had an established common understanding.

In summary, *Air Reduction* in multiple ways supports the Hospital's position.

Based upon the language, practice, and bargaining history, the Union's position that bargaining unit employees have absolute preference to vacation must be rejected.

18

V: The Issue:

Understandably, the Union and the Hospital construct the issue differently, based upon their differing perspectives of the collective bargaining agreement, past practice, and the tenor of the grievance. The Union believes the issue is "whether the Hospital has the right to deny bargaining unit members their chosen vacation dates when those same dates are requested by working supervisors who do similar work." The Hospital, on the other hand, based upon the last statement in its brief, believes that the issue is "whether the collective bargaining agreement grants bargaining unit employees absolute preference for vacations."

Although I will address both positions, at the outset, I shall adhere to the grievance before me and state the issue as "whether the Hospital violated the Agreement when it denied employee Carol Konsugar the vacation she desired in December 2016. [19]

VI: Discussion:

The Grievance JX-2, while it appears to be filed on behalf of the Union's "rank and file", the only specific violation originally alleged with respect to the grievance filed on January 13, 2017 relates to Carol Konsugar, who requested a vacation during the week of December 25, 2017, and was denied. The request was denied because her working supervisor in that department also desired it, and they both could not be away at the same time. In order to decide this case, I have to analyze and discuss the positions articulated by the parties, which at first blush, are in somewhat stark contrast.

---

[19] As noted earlier herein, two other employees are also involved in the grievance, but very little about their positions, duties and skills was made a part of the hearing.

19

The Union argues that Section 2, the Recognition clause, entitles bargaining unit members to be granted their desired vacation requests based on the entitling language in Section 13(6) that "Vacation will, so far as possible, be granted at times most desired by the employees" and that the appearance of similar language in the Personnel Manual does not afford an equal or corresponding right to non-bargaining unit employees. The Hospital, on the other hand, takes the position that the language immediately following the quoted language that the "right to allow vacation periods and the right to change vacation periods is exclusively reserved to the Hospital." In my view, the answer to the question lies somewhere in between those two competing positions.

The Union supports its position by citing *Air Reduction* and some other cases in an industrial or manufacturing setting decided by well-known and respected arbitrators. However, *Air Reduction* involved the reservation of blackout periods exclusively for supervisors, a practice no longer employed by the Hospital, and those contracts contained language to insure "the orderly and efficient operation of the plant". The same is true of the other cases which have been cited by the Union. All of the cases recognize the Employer's need to schedule employee vacation based upon operating needs, while recognizing that they should not  be arbitrary in doing so. That is true in this case as well.  However, this case involves a Hospital, an acute care institution with employees possessing a myriad of skills, specializations and licenses, employed on a 24/7 basis every day of the year. Operating needs are therefore even more complex.

On the other hand, the Agreement does contain language in the vacation provision that vacations, so far as possible, be granted at times most desired by employees. I cannot conclude that the

20

subsequent reservation of exclusivity in allocating vacations entirely to the Hospital completely negates the first principle, "so far as possible." If that were true, the rights of the bargaining unit personnel with respect to vacations could always be negated. I also cannot conclude that the Personnel Manual, by utilizing the same language, affords a perfectly equal right to non-bargaining unit employees.

In view of the foregoing, the grievance filed by Carol Konsugar is relatively easy to resolve. Mr. Goodman testified credibly and without contradiction that Ms. Konsugar was needed in the HealthPlex during her desired vacation week, and therefore, it was not possible to grant her request. The Hospital, unfortunately, originally elected to rely upon its reservation of rights to deny the request, rather than operational needs or efficiency.

I would be remiss however, if I did not speak to the issue of what should occur in the situation where a bargaining unit employee and his/her working supervisor possess exactly the same skills and performs exactly the same tasks, and they both desire the identical vacation. The parties appear to expect guidance on this issue. It is probably going to be a rare occurrence, and in that situation, the policy described by Mr. Goodman should first be employed. Mr. Goodman at the hearing, described situations where dates cannot be changed, such as graduations, wedding and funerals, and those employee needs must and will somehow be accommodated. He also described the need to consider patient needs, fairness, and circumstances. However, if there are no special circumstances, and the work performed, and the reserved skills are identical, the working supervisor should not have a superior claim to the desired vacation week.[20] On the

---

[20] I disagree that inasmuch as a majority of the employees in the Hospital are not in the bargaining unit, the Hospital, based upon that factor alone, may honor vacation requests, apart from operating needs. The rights of bargaining unit employees do not depend upon rights accorded a larger component of non-union employees.

contrary, the superior claim, if it cannot be resolved, belongs to the bargaining unit member, in accordance with the Agreement's recognition clause and the language in the Vacation Section.

I recognize, of course, the Hospital's argument based upon bargaining history, but in my view, it does not squarely address the issue involved here. The 1977 agreement, and all those subsequent do not directly address the rights of non-bargaining employees in the vacation scheduling matrix with bargaining unit members. In 2009, the Union sought a specific restriction that "Non-bargaining unit employees will not be given vacation scheduling preference over bargaining unit employees" [21] and was unable to obtain it. Here, the provision seeks to restrict the Hospital from giving a preference to non-bargaining unit employees, which also does not address the "insofar as possible" prefatory language in the Agreement with respect to scheduling vacations for bargaining unit employees. Moreover, the evidence of past practice is rather sparse in the record because the conflicts rarely occurred in the past, and the conflicts when they occurred were often resolved.  I do not find that non-bargaining unit employees, including working supervisors, have a competing equal right to have their vacation choices, standing alone, accepted over the choice submitted by bargaining unit employees.

I will therefore grant the grievance with respect to the past utilization of "blackout weeks" which may have impacted Ms. Konsugar's choice of vacation. I will also grant the grievance to the extent that the Hospital may not reserve unto itself and the working supervisor the right to deny senior employees in the bargaining unit their desired vacation, when there is no operating need for the employee to be present during the desired vacation week because of skills, ability, and responsibilities that cannot also be performed by the working supervisor, notwithstanding the Hospital's reservation of the exclusive rights contained in Section 13 (6) the Agreement.

---

[21] MVHX-5

VII:  Award:

The grievance involving the denial of Carol Konsugar's grievance with respect to her chosen vacation in December 2016 is granted with respect to the utilization of the Hospital of "Black Out weeks" which should no longer be utilized. The Grievance is also granted by limiting the right of the Hospital to deny bargaining unit employees their desired vacations solely because their working supervisor also desires that same time, when the employee's duties and responsibilities are identical to the working supervisor and no operating need prevents the bargaining unit employee from receiving the preference.[22]

I shall reserve jurisdiction for the next 60 days, if it is necessary to clarify any aspect of this Decision and Award.

Dated:  February 20, 2018                      _____

                                                Gerald Kobell, Arbitrator

---

[22] I make no finding with respect to situations where the working supervisor is senior to the bargaining unit employee, since it was not discussed at the hearing, or in the briefs. It could be a factor in assessing operating needs or "impossibilities".

23